**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
───────────────────────────────────────

STEUBEN FOODS, INC.,                          **SUPERSEDING REPORT AND**
                                               **RECOMMENDATION REGARDING**
                             **Plaintiff,**    **CONSTRUCTION OF THE PHRASES**
                                               **"ASEPTICALLY DISINFECTING"**
                                               **AND "AT A RATE GREATER THAN**
                                               **100 BOTTLES PER MINUTE"**

**v.**
                                               **1:10-cv-00780-EAW-JJM**
**OYSTAR GROUP ET AL.,**                       **1:12-cv-00904-EAW-JJM**
                                               **1:13-cv-00892-EAW-JJM**
                             **Defendants.**   **1:13-cv-01118-EAW-JJM**
───────────────────────────────────────

Familiarity with the background of these patent infringement actions (and with the court's abbreviation of party names) is presumed. This Report and Recommendation supersedes my February 24, 2020 Report and Recommendation partially construing the phrase "aseptically disinfecting" [595][1] and my February 11, 2020 Report and Recommendation construing the phrase "at a rate greater than 100 bottles per minute" [594].

## **"ASEPTICALLY DISINFECTING"**

The phrase "aseptically disinfecting" appears in several claims of the patents in suit. *See*, *e.g.*, claims 1-20 of U.S. Patent No. 6,945,013 [1-1]; claim 40 of U.S. Patent No. 6,536,188 [426-3]. On January 31, 2018 I held a hearing pursuant to Markman v. Westview

---

[1]      Unless otherwise indicated, bracketed references are to CM/ECF docket entries in 12-cv-904. Many of the documents referred to in this opinion have been filed in all of the Steuben cases, under different docket numbers.

Instruments, Inc., 517 U.S. 370 (1996) addressed solely to the meaning of that phrase [485] - in particular, what type of sterilant may be used for "aseptically disinfecting".[2]

   The "meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). The parties agree that the effective filing date of the patents in suit is February 2, 1999. I initially believed that the sterilant must be FDA "approved" rather than "approvable" as of February 2, 1999, since that was the language used in the specification. See my February 13, 2018 Rule 56(f)(3) Notice [486], pp. 2-3 and n. 2.[3]

   I later changed my mind, concluding that the sterilant must be FDA "approvable" rather than "approved" as of February 2, 1999, since there was otherwise no way to account for the fact that claim 40 of the '188 patent [426-3] expressly listed "peroxyacetic acid and hydrogen peroxide" (commonly known as oxonia) as the sterilant, and it was undisputed that oxonia was not an FDA approved sterilant as of the February 2, 1999 effective filing date. See my April 20, 2018 Decision and Order [501].

   However, "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions", In re Papst Licensing Digital Camera Patent Litigation, 778 F.3d 1255, 1261 (Fed. Cir. 2015), and "it is never too late to surrender former views to a better considered position". South Dakota v. Wayfair, Inc., ___U.S.___, 138 S. Ct. 2080, 2100 (2018) (Thomas, J.

---

[2] At the parties' request, this will confirm that I do not take issue (as if I could!) with the Federal Circuit's discussion of the meaning of "aseptic" in Nestle USA, Inc. v. Steuben Foods, Inc., 686 Fed. App'x 917 (Fed. Cir. 2017). However, the meaning of "aseptically disinfecting" was not at issue in that case.

[3] In the interest of time and space, the contents of my prior decisions relating to "aseptically disinfecting" are incorporated herein by reference.

concurring). Upon further reflection, several factors cause me to return to my original view that the phrase requires the use of a sterilant that had already been approved by the FDA as of the effective filing date (February 2, 1999).

In the first place, "arguments made during prosecution shed light on what the applicant meant by its various terms." Springs Window Fashions LP v. Novo Industries, L.P., 323 F.3d 989, 995 (Fed. Cir. 2003). In proceedings before the Patent and Trademark Office, Steuben repeatedly asserted that the invention required the use of an FDA *approved* sterilant: "in order to meet the FDA definition of 'aseptic' the aseptic filler must, *inter alia*, use an FDA approved sterilant" (Steuben's Appeal Brief [417-18], p. 12); "the specification makes clear that the methods of the invention are FDA compliant. The Background section explains that '[f]or the aseptic packaging of food products, an aseptic filler must, for example, use an FDA (Food and Drug Administration) approved sterilant'". Steuben's Response [426-30], p. 32.

In fact, Steuben expressly *disclaimed* the use of a sterilant which had not been approved by the FDA as of the effective filing date: "At the time the application that matured into the '013 patent was filed, the only FDA approved sterilant for use in low acid packaging was hydrogen peroxide, as such chlorine *could not have been used* in aseptic packaging system as claimed by the '013 patent." Steuben's Reexamination Appeal Brief [426-11], p. 31 (emphasis added). "A patentee cannot make representations about claim language during prosecution to avoid prior art and then escape these representations when trying to show infringement." Wi-LAN USA, Inc. v. Apple Inc., 830 F.3d 1374, 1390 (Fed. Cir. 2016).

Secondly, testimony of those skilled in the art supports that conclusion. "In view of Steuben's patents and how the term 'FDA-approved sterilant' was used during the prosecution of the Patents-at-issue, a POSITA [person of skill in the art] would have understood the term to

mean a sterilant that was approved by the FDA for use to sterilize food packaging for low-acid aseptic foodstuffs." Report and Declaration of Dr. Kevin M. Keener (12-cv-904) [427-8], ¶27. "[I]t is my opinion that a POSITA would have understood that hydrogen peroxide was the *only* FDA approved chemical sterilant for low-acid aseptic food packaging on the Effective Filing dates. Steuben recognized this during prosecution of the Patents-at-issue." Id., ¶29. "In 1999, and even into the mid-2000s, there was no regulatory mechanism to seek . . .  acceptance by the FDA[ ] of a new commercial sterilant, such as POAA/oxonia, for use as a food-packaging sterilant in an aseptic process . . . . Thus, on February 2, 1999, the POSITA would not have thought it possible for POAA/oxonia, or any other sterilant (e.g., chlorine), to meet the FDA's standards for aseptic processing." Declaration of Bruce A. Cords, Ph.D. [426-72], ¶40.

   Finally, although "validity analysis is [not] a regular component of claim construction", Phillips, 415 F.3d at 1327, "[c]laim construction should not . . . be blind to validity issues: claims should be so construed, if possible, as to sustain their validity". MBO Laboratories, Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1332 (Fed. Cir. 2007). In order to be valid, a patent must demonstrate "utility" - *see* 35 U.S.C. §101 ("[w]hoever invents or discovers any new *and useful* process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor") (emphasis added). Utility "is determined as of the application filing date" (In re Brana, 51 F.3d 1560, 1567, n. 19 (Fed. Cir. 1995)), and requires that the invention provide a "specific benefit" to the public in its "currently available form". Brenner v. Manson, 383 U.S. 519, 534-35 (1966).

   "In other words, one skilled in the art must be able to use a claimed discovery in a manner which provides some *immediate benefit to the public* . . . . [A]n application must show that an invention is useful to the public as disclosed in its current form, not that it may prove

-4-

useful at some future date." <u>In re Fisher</u>, 421 F.3d 1365, 1371 (Fed. Cir. 2005) (emphasis in original). Only a sterilant which had already been approved by the FDA could provide an "immediate benefit to the public". While Steuben suggests that as of the filing date, oxonia would be an approved sterilant "in the future" ([485], p. 48), it told the PTO that "skilled artisans understood at the time of filing that Oxonia was unlikely to achieve FDA-levels of aseptic" (Steuben's Response [427-22], p. 32), and that "as of 1999 there would have been no chance that the FDA would accept an oxonia-based system". Steuben's Reply [426-10], p. 5.

"[T]he meaning which the inventor gives to his words cannot be made to depend upon subsequent events, but should appear when the application is filed." <u>Quantum Corp. v. Rodime PLC</u>, 851 F. Supp. 1382, 1385 (D. Minn. 1994), <u>aff'd</u>, 65 F.3d 1577 (Fed. Cir. 1995). Thus, "[w]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing". <u>PC Connector Solutions LLC v. SmartDisk Corp.</u>, 406 F.3d 1359, 1363 (Fed. Cir. 2005)

I recognize that construing the phrase "aseptically disinfecting" to require a sterilant that was already approved as of the February 2, 1999 filing date is difficult to reconcile with the fact that the specification expressly mentions oxonia as a possible sterilant.[4] Although courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification", <u>Verizon Services Corp. v. Vonage Holdings Corp.</u>, 503 F.3d 1295, 1305 (Fed. Cir. 2007), that rule "is not a panacea". <u>PSN Illinois, LLC v. Ivoclar Vivadent, Inc.</u>, 525 F.3d 1159, 1166 (Fed. Cir. 2008). Thus, "where the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a construction is

---

[4]      "The present invention uses an aseptic sterilant such as hydrogen peroxide . . . or oxonia to sterilize the bottles." '013 patent [1-1], col. 4, l. 50-52.

permissible . . . . This follows from our precedent that the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 1327 (Fed. Cir. 2002).

For these reasons, I recommend that the court construe the phrase "aseptically disinfecting" to require the use of a sterilant which had been approved by the FDA as of February 2, 1999 - namely, hydrogen peroxide.[5] Since claim 40 of the '188 patent is the only claim at issue which expressly defines oxonia as the sterilant, this construction, if adopted, will likely lead to that claim being declared invalid.[6] However, that is a question for another day.

### "AT A RATE GREATER THAN 100 BOTTLES PER MINUTE"

The phrase "at a rate greater than 100 bottles per minute" likewise appears in several claims of the patents in suit. *See*, *e.g*., claims 1 and 18-20 of the '013 patent [1-1] ("aseptically disinfecting the bottles at a rate greater than 100 bottles per minute") and claims 19 and 40 of the '188 patent [426-3]. ("filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute").

Steuben argues that the phrase "need[s] no construction" (Steuben's Opening Markman Submission [417], p. 61), reasoning that "'the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim

---

[5]     "A skilled artisan would . . . have been aware that hydrogen peroxide was the only FDA approved sterilant at the time of filing." Steuben's Response [426-30], p. 41.

[6]     *See* Virtual Solutions, LLC v. Microsoft Corp., 925 F. Supp. 2d 550, 569-70 (S.D.N.Y.), aff'd, 540 Fed. App'x 997 (Fed. Cir. 2013) ("claim 1 requires that two apparently contradictory statements hold true . . . . I therefore hold that claim 1 and all of its dependent claims are invalid"); Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("where . . . claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated").

construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words' . . . . Such is the case here". Id., p. 62 (*quoting* Phillips 415 F.3d at 1314). On the other hand, defendants GEA, Nestlé and Jasper argue that the phrase should be construed to have "no upper limit", and defendants Shibuya and HP Hood suggest that the phrase should be construed to mean "at a rate ranging from 100 bottles to infinite bottles per minute". Joint Claim Construction and Prehearing Statement [400], p. 8.[7]

"The Patent Act requires that a patent specification conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014) (emphasis in original). The patent must "inform, with reasonable certainty, those skilled in the art about the scope of the invention". Id. While "[s]ome modicum of uncertainty" is to be expected on "account [of] the inherent limitations of language" (id. at 909), the language chosen "must be precise enough to afford clear notice of what is claimed". Id.

"[W]e look to the words of the claims themselves to define the scope of the patented invention." Phillips, 415 F.3d at 1312. Steuben argues that "[t]he claim term 'a rate greater than 100 bottles per minute' means exactly what it says - the filling or disinfecting the bottles occurs at a rate greater than 100 bottles per minute", and that "those skilled in the art would read this claim term according to its ordinary meaning - and readily understand its meaning." Steuben's Markman Brief in Reply (10-cv-781 [333]), p. 19. While it is undisputed that the claim language at issue does not express an upper rate limit, Steuben suggests that "open-ended claims are not inherently improper . . . . They may be supported if there is an

---

[7]     Although Steuben's action against Shibuya and Hood was transferred to the District of Delaware on November 22, 2019 (10-cv-781 [481]), their Markman submission and Steuben's response were both submitted to this court long before that transfer. 10-cv-781 [318, 333].

inherent, albeit not precisely known, upper limit and the specification enables one of skill in the art to approach that limit". January 29, 2020 conference [591], p. 18.

In support of that proposition, Steuben quotes Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007). However, in Anderson evidence *was* submitted concerning an "inherent upper limit": "Mr. Deaner testified that a person of skill in the art *would* recognize that the upper limit of the Young's modulus of the structural member would lie somewhere between the Young's modulus of the wood fiber and that of the polymer used in the composition." 474 F.3d at 1377 (emphasis added).[8]

Here, by contrast, while suggesting that "[a] skilled artisan *may* looking at the full scope of the claim arrive on a practical upper limit", Steuben's counsel concedes that "I don't know that they would. It depends on the evidence that defendants would put in". [591], pp. 31-32 (emphasis added). However, the deadline for submitting evidence bearing on claim construction has long since passed.

Defendants' experts unanimously conclude that "[a] person of ordinary skill in the art would understand from the . . . claim language that the rate requirements have no upper limit. In other words, a system processing *any number* of bottles greater than 100 would satisfy the rate requirements of the '013 patent and '188 patent claims . . . . The claims have no implicit upper rate limit". *See* Declaration of Dennis R. Heldman, Ph.D. [426-73], ¶129; Declaration of Keith A. Ito [426-71], ¶94; Declaration of Bruce A. Cords, Ph.D. [426-72], ¶¶89-90.

---

[8]       Steuben's reliance upon Milwaukee Electric Tool Corp. v. Snap-On Inc., 271 F. Supp. 3d 990 (E.D. Wis. 2017) is likewise misplaced. In that case, the court concluded that "[t]he skilled artisan would understand that the nature of the cells would create a natural upper limit to the potential discharge current, and so disclaiming an infinite discharge current would have been unnecessary". Id. at 1039.

-8-

Steuben suggests that "to the extent there is an inherent upper limit, it's [b]ounded only by something like building size . . . . [I]f defendants want to take the position that this covers thousands of bottles per minute, you could . . . put these machines in series and you could meet the limitation going up to a high number of bottles per minute. It's not limited to a single machine. It's a method." [591], p. 18.[9] "[D]o they enable a million bottles per minute? . . . . [I]t's a method claim . . . with unbounded building size, you could daisy chain these machines together". Id., pp. 30-31. However, nothing in the patent claims or specifications even mentions (much less limits) building size - in fact, nothing limits the "method" to machines located in a single building. Under Steuben's approach, there could be multiple machines in multiple buildings.

When asked whether he would understand a similar phrase ("at least 100 containers per minute") to have no upper limit, Steuben's expert, Andre Sharon, Ph. D., testified that "if I have all the resources in the world, and all the space, I can build this theoretical . . . giant machine that can make many, many, many bottles per minute . . . . It's not like you can go to infinity because you'll never reach infinity. But from - so theoretically, you know, the upper bound[ary] is very, very high. The - from a practical matter, that is another issue, how much space do you have, and things like that . . . . I cannot give you an upper number. I mean, it can be a large number. I mean, if we're talking theoretically. You know, if we're talking in a factory and a certain, you know, floor space, then there's practical limits. I don't see any limits given here in the patents. I couldn't give you an upper limit . . . [T]hat's my answer". 13-cv-892, [292-3], pp. 362-64.

---

[9]     All of the claims containing the language at issue are method claims except claim 40 of the '388 patent, which is directed to "a device". [426-3], col. 16. However, that claim likewise offers no upper rate parameters.

Steuben asks the court to "reject Defendants' attempt to rewrite the claim terms by improperly adding limitations that are not included in the claim language", arguing that "if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop". Steuben's Opening Markman Submission [417], pp. 63, 64 (*quoting* Phillips, 415 F. 3d at 1312 and McCarty v. Lehigh Valley R.R. Co., 160 U.S. 110, 116 (1895)). However, as GEA points out, "Steuben is the party trying to impose some yet-to-be-revealed upper limit on claim terms that plainly have none". GEA's Markman Submission [427], p. 36.

Steuben's attempt comes too late. "Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth." E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988). "[T]he patent drafter is in the best position to resolve the ambiguity in patent claims." Nautilus, 572 U.S. at 910. "[T]he place to do so is in the specification of the inventor's application, and the time to do so is prior to . . . its issuance as a United States patent." Lear Siegler, Inc. v. Aeroquip Corp., 733 F.2d 881, 889 (Fed. Cir. 1984).

Therefore, I agree with defendants GEA, Nestlé and Jasper that there is neither an express nor implicit upper limit to the phrase "at a rate greater than 100 bottles per minute". While Steuben dismisses Shibuya/Hood's proposed construction ("at a rate ranging from 100 bottles per minute to infinite bottles per minute") as both "far-fetched" and "absurd" (Steuben's Markman Brief in Reply (10-cv-781 [333]), p. 19), it is neither. The word "infinite" means "extending indefinitely" (Webster's Third New International Dictionary (Unabridged)), which does not necessarily mean "extending forever". Webster's also defines "infinite" to mean "indefinite in number" - and in that sense, use of the word "infinite" is quite appropriate.

"The duty of the trial judge is to determine the meaning of the claims at issue . . . . In the exercise of that duty, the trial judge has an independent obligation to determine the meaning of the claims", Exxon Chemical Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1555 (Fed. Cir. 1995), and is "not bound by the arguments of the parties". Marine Polymer Technologies, Inc. v. HemCon, Inc., 672 F.3d 1350, 1359, n. 4 (Fed. Cir. 2012). Whether or not there might be a theoretical upper limit to the phrase "at a rate greater than 100 bottles per minute", for purposes of claim construction that limit cannot be defined. Therefore, I recommend that the court construe the phrase "at a rate greater than 100 bottles per minute", as used in claims 1 and 18-20 of the '013 patent and claims 19 and 40 of the '188 patent, to mean "at a rate ranging from greater than 100 bottles per minute to an infinite (that is, indefinite) number of bottles per minute".

## CONCLUSION

For these reasons, I recommend that the court adopt the constructions discussed herein. Unless otherwise ordered by Judge Wolford, any objections to this Report and Recommendation must be filed with the clerk of this court by April 24, 2020 . Any requests for extension of this deadline must be made to Judge Wolford.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988). The parties are reminded that,

pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.


Dated: March 16, 2020                    _____/s/ Jeremiah J. McCarthy
                                         JEREMIAH J. MCCARTHY
                                         United States Magistrate Judge